FILED IN CLERK'S OFFICE
U.S.D.C. -Gainesville

SEP 17 2010

JAMES N. HATTEN, Clerk
By: Don Stanhope
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SEMEGA ABDOULAYE, | : | PRISONER CIVIL RIGHTS |
| | : | 42 U.S.C. § 1983 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. |
| THOMAS E. BROWN, DeKalb | : | 1:07-CV-3071-WCO |
| County Sheriff; OFFICER M. HICKS; | : | |
| OFFICER PALMER; OFFICER M. | : | |
| CROWE; OFFICER JACKSON; | : | |
| OFFICER WILLIAMS; OFFICER | : | |
| THOMAS; OFFICER RAMIREZ; | : | |
| LIEUTENANT CROSBY; | : | |
| GRIEVANCE COORDINATOR | : | |
| MYLES; and NURSE CHAPMAN, | : | |
| | : | |
| Defendants. | : | |

## ORDER AND OPINION

Plaintiff has filed this civil rights action. The matter is now before the court for consideration of the motion for summary judgment filed by defendants DeKalb County Sheriff Thomas E. Brown, Officer Maceo Hicks, Officer Michelle Crowe, Officer Aniceto Ramirez, and Lieutenant Kevin Crosby [104].

I.   **Factual Summary**

Plaintiff's claims against defendants that have been allowed to proceed are as follows: (1) Sheriff Brown violated his First Amendment rights by installing a

telephone system at DeKalb County Jail that impedes his ability to contact his family members residing outside of the United States; (2) Lieutenant Crosby and Officers Hicks and Crowe intentionally delivered the wrong food tray to plaintiff, served him foods to which he is allergic, and failed to correct the error when notified; and (3) Officer Ramirez refused to respond to plaintiff's complaint that he was having trouble with the cellmate who eventually broke his nose.[1] (*See* Sept. 17, 2009 Order 1-2.)

Defendants have submitted a statement of undisputed material facts supported by affidavits and plaintiff's deposition testimony. Although now represented by counsel, plaintiff has failed to file a response to defendants' statement of undisputed material facts, as required by Local Rule 56.1B(2)(a). Accordingly, the court deems defendants' undisputed facts to be admitted. *See* LR 56.1B(2)(a), NDGa; *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (stating, "The proper course in applying Local Rule 56.1 at the summary judgment stage is for a district court to

---

[1] To the extent that the court allowed any other claims to proceed, plaintiff has either failed to identify the specific individuals who allegedly violated his rights, *see Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008) ("[A] complaint will be held defective . . . if [it] fails to connect the defendant with the alleged wrong"), or failed to serve those defendants, as discussed more fully in Section III below. Accordingly, the court will not address those additional claims on the merits in this Order.

disregard or ignore evidence relied on by the respondent-but not cited in its response to the movant's statement of undisputed facts-that yields facts contrary to those listed in the movant's statement").

The undisputed facts are as follows: the DeKalb County Jail's telephone usage policy allows inmates to initiate collect telephone calls to persons of their choosing subject to equitable access by all inmates. (Aff.. of Thomas Brown ¶ 5, Apr. 20, 2009.) The system automatically terminates the calls if it detects that the recipient is attempting to transfer the call or add a third party to the line. The purpose of this automatic blocking system is to prevent contact between inmates and current and/or future co-conspirators. All calls are recorded as an additional precaution. When an inmate initiates a call, a recording notifies the recipient that it is a collect telephone call from the jail and identifies the inmate caller in his or her own voice. The recipient may then either accept the call or not, in which case the call is immediately terminated. The telephone system is not designed to allow inmates to make international telephone calls. The only way an inmate would be able to make such calls is with a calling card, but the jail does not allow calling cards. (*Id.* at ¶¶ 6-7.)

Jail policy also limits the amount of money an inmate may have in his or her account and does not permit inmates to carry items of value on their person. (*Id.* at

3

¶ 7.) The purpose of these procedures is to prevent inmates from using force or coercion against other inmates. (*Id.* at ¶ 7.) Allowing inmates to carry calling cards could lead to, among other things, theft and intimidation by stronger inmates. Permitting an inmate to have an excessively large amount of money in his account for telephone calls could also lead to intimidation. Moreover, the use of calling cards could have an adverse effect on the monitoring of calls within the jail telephone system. Finally, as there are over 40,000 people rotating in and out of the jail annually and a shortage of jail employees, absent these policies, there would be a serious impact and strain on detention staff to prevent theft, assault and coercion among inmates. (*Id.* at ¶ 8.)

During plaintiff's incarceration at the DeKalb County Jail, his friends visited him, and he made local and long distance calls within the United States, but could not make international calls. (Defs.' Statement Undisputed Material Facts ¶ 22) (citation omitted). Plaintiff was able to contact his family members residing outside the United States by handwriting them letters. (*Id.*) Sheriff Brown never had any personal contact with plaintiff. (Aff. of Thomas Brown ¶ 10.).

Trinity Services Group ("Trinity") is contracted to provide food services at the jail. (*Id.* at ¶ 9; Aff. of Michelle Crowe ¶ 3, June 3, 2010.) Trinity staff prepare food

trays for all inmates, including separate trays for inmates with medical dietary restrictions, marked with the inmate's name and location. (Aff. of Michelle Crowe ¶ 3.). Sheriff's Office employees then distribute the meals according to the names on the trays. (*Id.*)

When plaintiff was admitted to the jail in October of 2006, he weighed 166 pounds. (Aff. of Monica McGowan ¶ 5, Apr. 17, 2009.) At periodic times throughout his stay at the jail, plaintiff requested that certain foods be eliminated from his diet. (*Id.* at ¶ 6.) When plaintiff left the jail in February of 2008, his diet excluded cold cuts, salami, bologna, tomatoes, fish, oatmeal and grits. (*Id.*) In January of 2008, plaintiff weighed 181 pounds. (*Id.* at ¶ 14.) Plaintiff left the jail on February 6, 2008. (Aff. of Thomas Brown ¶ 4.)

Officers distributed breakfast trays first to inmates receiving a special diet. (Defs.' Statement Undisputed Material Facts ¶ 24.) If plaintiff noticed that the tray was incorrect, he would notify the officer, who would tell him "let me see what I can do." (*Id.*) Depending on the day, plaintiff could eat peanut butter and jelly sandwiches, milk, biscuits, or juice for breakfast. Plaintiff rarely had problems receiving his correct tray at lunch or dinner. (*Id.*)

On August 18, 2007, plaintiff informed Officer Crowe that he had not received his breakfast from the morning watch. (Aff. of Michelle Crowe ¶ 5.) On investigation, Officer Crowe learned that the kitchen did not have any more breakfast food to prepare a diet tray for plaintiff, but had prepared a sandwich with meat that plaintiff refused to eat due to his dietary restriction of no cold cuts. Some time after Officer Crowe called the kitchen a second time on plaintiff's behalf and the kitchen sent him a peanut butter sandwich. (*Id.*) Officer Crowe never refused to provide meals for plaintiff. (*Id.* at ¶ 7.)

On or about November 20, 2007, Lieutenant Crosby reviewed the results of Sergeant Leonard's investigation of plaintiff's grievance alleging that Officer Joel Head had prevented him from receiving lunch on one occasion. (Aff. of Kevin Crosby ¶ 5, May 27, 2010.) Lieutenant Crosby spoke with Officer Head, who stated that he had provided a lunch sack to plaintiff. Additionally, Sergeant Leonard informed Lieutenant Crosby that, upon questioning, all inmates in plaintiff's pod stated that they had received lunch that day. Finding no evidence to support plaintiff's complaint, Lieutenant Crosby signed off on Sergeant Leonard's conclusion that plaintiff's accusation was unfounded. (*Id.*) Lieutenant Crosby never personally served plaintiff any meal. (*Id.* at ¶ 6.)

On two occasions during the week of November 25 and December 1, 2007, plaintiff complained to Officer Hicks that he had not received a diet tray from the kitchen. (Aff. of Maceo Hicks ¶ 3, May 3, 2010.) On both occasions, Officer Hicks confirmed that plaintiff had received the correct tray, but plaintiff complained that he did not want to eat what was served to him. Officer Hicks explained that he did not prepare the breakfast trays, but simply served what the kitchen prepared. After these incidents, Officer Hicks would specifically check plaintiff's tray to ensure that he received a diet tray from the kitchen. (*Id.*) As such, when Officer Hicks noticed that the kitchen had sent oatmeal for plaintiff's breakfast on January 9, 2008, Officer Hicks obtained a diet tray from the kitchen and served both trays to plaintiff, informing plaintiff that he could eat whatever he wanted. (*Id.* at ¶ 4.) Officer Hicks never refused to provide meals for plaintiff. (*Id.* at ¶ 5.)

On April 10, 2007, Officer Ramirez was inside the central tower watching the inmates in the pods. (Aff. of Aniceto Ramirez ¶ 5, May 2, 2010.) This position allowed Officer Ramirez to see the day room, but not the individual cells if their doors were closed. (*Id.* at ¶ 4.) Each cell, however, contains a call button that, when pressed, emits an audible sound in the central tower, and a light flashes on the control panel to indicate which cell button was activated. In that event, Officer Ramirez could

7

open the doors from his position in the central tower and allow the inmate to enter the day room to speak with the security officer. (*Id.*) On that day, Officer Ramirez did not see any signs of distress nor were there any sounds or flashing lights related to plaintiff's cell. (*Id.* at ¶ 5.)

At approximately 10:20 p.m., Officer Ramirez learned that plaintiff and another inmate, Watkins, were fighting in their cell. (*Id.* at ¶ 6.) As Officer Ramirez made his way to the pod, the door to plaintiff's cell popped open and Watkins left the cell. (*Id.*) Plaintiff stated that Watkins had cut him with a razor, and as Watkins left the cell, plaintiff exited the cell punching Watkins. At Officer Ramirez's command, plaintiff stopped punching Watkins. (*Id.*) Officer Ramirez separated the two inmates and placed plaintiff in handcuffs. (*Id.* at ¶ 7.) After Officer Ramirez's search of plaintiff revealed no weapons, he escorted plaintiff to the medical clinic. Officer Ramirez had no further contact with plaintiff relating to his medical treatment. (*Id.*) Officer Ramirez also escorted Watkins to the medical clinic for treatment of the cuts on his back and chest. (*Id.* at ¶ 8.) Watkins was relocated to another section of the jail, and both inmates were charged with violating jail policies due to their altercation. (*Id.*)

At the jail's medical clinic, plaintiff complained that his nose hurt and was referred to Grady Hospital for further evaluation. (Aff. of Monica McGowan ¶ 7.)

Hospital staff diagnosed plaintiff's injury as a nose bleed, prescribed Afrin nasal spray, Ibuprofen and Tylenol 3, instructed him to hold his nose to prevent bleeding, and told him to blow his nose and use the nasal spray if the bleeding continued. (*Id.* at ¶ 9.) The jail pharmacy distributed plaintiff's prescription. (*Id.* at ¶ 11.) On November 16, 2007, plaintiff returned to the jail medical clinic requesting follow up care for his nose injury. (*Id.* at ¶ 12.) Medical staff reviewed plaintiff's hospital records and found no follow up or surgical referral. A physical examination revealed that plaintiff's nose was functional and had a "good cosmetic appearance," and thus, medical staff determined there was no need for surgery. (*Id.*)

## II. Analysis

Defendants argue that they are entitled to summary judgment because: (1) the jail's telephone usage policy did not violate plaintiff's constitutional rights; (2) defendants were not deliberately indifferent to his special dietary needs; (3) defendants provided constitutionally adequate medical treatment for his nose injury; and (4) Sheriff Brown cannot be held vicariously liable for the actions of his subordinates. (Defs.' Br. Supp. Mot. Summ. J. 5-27.) Defendants also contend that they are entitled to qualified immunity. (*Id.*)

Plaintiff responds, through counsel, that defendants are not entitled to qualified immunity because they violated his constitutional rights. Specifically, plaintiff maintains, in relevant part, that: (1) the jail's telephone policy, which is not rationally related to a legitimate penological interest, prohibited him from calling his family overseas during his entire incarceration, and his letters rarely reached their destination; (2) jail staff continually served him the wrong meals; (3) on April 10, 2007, he repeatedly pressed the emergency button in his cell to alert authorities that he was in imminent danger of being attacked by his cellmate, but his calls were ignored by "the officer on duty"; and (4) Sheriff Brown should be held vicariously liable because plaintiff's grievances and letters put him on notice of the constitutional deprivations, but he failed to act. (Pl.'s Mem. Supp. Mot. Opp'n Defs.' Mot. Summ. J. 12-23, 27-29.)

Defendants reply that plaintiff has not shown a genuine issue of material fact as to his telephone access, has presented no evidence that defendants failed to bring him his diet trays, and has no evidence that Officer Ramirez heard or ignored any distress call. (Defs.' Reply Br. 3-9.) Defendants further contend that plaintiff has offered no evidence showing a widespread pattern of abuse that put Sheriff Brown on notice of the need to correct the alleged deprivations. (*Id.* at 12-13.)

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment bears the initial burden of demonstrating that no dispute as to any material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party's burden may be discharged by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Id.* at 325. In determining whether the moving party has met this burden, the district court must "view the evidence and all factual inferences . . . in the light most favorable to the party opposing the motion." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (internal quotation omitted).

Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmovant may not rest upon mere allegations or denials contained in his pleadings. *Anderson v. Liberty Lobby,*

11

*Inc.*, 477 U.S. 242, 249 (1986). Additionally, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to defeat summary judgment. *Id.* at 252. Rather, the court must determine "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.*

### B. Telephone Access

Under the First Amendment, pre-trial detainees have a right to "at least some" telephone access in order to contact friends and family, subject to reasonable restrictions based on legitimate order and security concerns. *Feeley v. Sampson*, 570 F.2d 364, 374 (1st Cir. 1978); *see also Pope v. Hightower*, 101 F.3d 1382, 1384-85 (11th Cir. 1996) (applying *Turner v. Safley*, 482 U.S. 78, 89-91 (1987) factors to determine reasonableness of restrictions on prisoner's First Amendment right to telephone access). In determining reasonableness, the court should consider: "(1) whether there is a 'valid, rational connection' between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources

generally; and (4) whether the regulation represents an 'exaggerated response' to prison concerns." *Pope*, 101 F.3d at 1384 (citing *Turner*, 482 U.S. at 89-91). Alternative means of communication include receiving visitors and using written correspondence. *Id.* at 1385.

The undisputed material facts show that defendants are entitled to summary judgment on this claim. First, the jail's collect-only telephone policy is rationally connected to the governmental interest in reducing criminal activity and harassment. The telephone system is designed to prevent contact between inmates and current and/or future co-conspirators, and this design does not allow inmates to make international calls without a calling card. (Aff. of Thomas Brown ¶¶ 5-6.) Calling cards, however, are prohibited because they could lead to theft and intimidation by stronger inmates and also could have an adverse effect on the monitoring of calls within the jail telephone system. (*Id.* at ¶ 7.) Additionally, permitting an inmate to have an excessively large amount of money in his account for telephone calls could also lead to intimidation. (*Id.*)

Second, plaintiff had an alternative means of exercising his First Amendment right to communicate with family and friends. Plaintiff could receive visitors and correspond with his family overseas. Third, allowing inmates to carry calling cards

13

or large amounts of money in their inmate accounts for telephone calls would severely tax the detention staff in their efforts to prevent assault, theft and coercion among inmates. (Aff. of Thomas Brown ¶ 8.) Finally, plaintiff has proposed no ready alternatives that would fully accommodate his "claimed right at a de minimis cost to valid penological interests." *Pope*, 101 F.3d at 1385.

### C. Dietary Restrictions

Prison conditions are subject to "scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Eighth Amendment prohibits deliberate indifference to prison conditions that deprive an inmate of essential human needs such as food, clothing, shelter, medical care, and reasonable safety. *Helling v. McKinney*, 509 U.S. 25, 31-32 (1993). Further, the Due Process Clause of the Fourteenth Amendment protects pre-trial detainees from constitutionally inadequate prison conditions, and claims related thereto generally are analyzed under the same standard that applies to Eighth Amendment prison condition claims brought by convicted prisoners. *Purcell ex rel. Estate of Morgan v. Toombs County, Ga.*, 400 F.3d 1313, 1318 n.13 (11th Cir. 2005); *see also Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985) (holding that "in regard to providing pretrial detainees with such basic necessities as food [and] living space, . . . the minimum standard

14

allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons").

To establish a constitutional prison-conditions claim, the plaintiff must show: (1) prison conditions that are objectively, "sufficiently serious" and (2) deliberate indifference by the defendant prison official. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (stating, "Negligence does not suffice to satisfy this standard"). A prison official is deliberately indifferent if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The conditions alleged must be extreme, resulting in a denial of "the minimal civilized measure of life's necessities" and posing an excessive or substantial risk of serious harm. *Id.* at 834.

There is no evidence to support plaintiff's claim that Lieutenant Crosby and Officers Hicks and Crowe intentionally delivered the wrong food tray to him, served him foods to which he is allergic, and failed to correct the error when notified. Rather, the undisputed evidence shows that, on the few occasions when plaintiff complained to Officers Hicks and Crowe that he had received a meal that did not comply with his dietary restrictions, they contacted kitchen staff to investigate and corrected any error. Officers Hicks and Crowe never refused to provide meals for plaintiff. Lieutenant

Crosby never personally served plaintiff any meal, but merely found, on investigation, that plaintiff's accusation that Officer Head had prevented him from receiving lunch was unfounded. The court further notes that plaintiff's allegation that he lost weight due to defendants' failure to provide him correct meals is belied by the record, which reveals that plaintiff gained fifteen pounds. (Aff. of Monica McGowen ¶¶ 5, 14.) Accordingly, defendants are also entitled to summary judgment on this claim.

### D. Failure to Protect Against Attack

The protection of inmates against attacks from other inmates is a condition of confinement subject to the strictures of the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993). Because plaintiff was a pre-trial detainee at the time the alleged events giving rise to this lawsuit occurred, this claim should be analyzed under the Due Process Clause of the Fourteenth Amendment. *Cagle v. Sutherland*, 334 F.3d 980, 985-86 (11th Cir. 2003). However, "the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments." *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001). In order to establish a claim based on a failure to prevent harm by another inmate, a plaintiff must produce evidence to show that (1) the conditions under which the attack took place

posed a "substantial risk of serious harm," (2) the defendants had actual knowledge of but disregarded that substantial risk, and (3) causation. *Purcell*, 400 F.3d at 1319. Plaintiff may meet this standard by alleging that the defendant "knew that inmate-on-inmate violence was occurring on a regular basis" and that "the violence sometimes resulted in injuries requiring medical treatment." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995). "Proof of deliberate indifference requires more than does proof of negligence." *Jenkins v. DeKalb County, Ga.*, 307 F. App'x 390, 394 (11th Cir. 2009).

Plaintiff states that, on April 10, 2007, he pressed the emergency button in his cell for more than 45 minutes, but "the officer on duty" ignored this alert for assistance, and, as a result, plaintiff was assaulted by his cellmate and sustained a broken nose. (Aff. of Semega Abdoulaye ¶ 12, June 22, 2010.) It is undisputed, however, that Officer Ramirez, who was on duty at that time, did not see any signs of distress nor were there any sounds or flashing lights related to plaintiff's cell. (Aff. of Aniceto Ramirez ¶ 5.) Rather, as soon as Officer Ramirez learned that plaintiff and Watkins were fighting in their cell, he opened the cell door and went to investigate the situation. (*Id.* at ¶ 6.) Plaintiff presents no evidence that Officer Ramirez heard, but deliberately ignored any distress call or was otherwise aware that Watkins posed a

substantial risk of serious harm to plaintiff. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Moreover, the undisputed evidence reveals that plaintiff's only injury was a nose bleed, not a broken nose. (Aff. of Monica McGowan ¶¶ 9, 11-12.) Therefore, Officer Ramirez is entitled to summary judgment as to this deliberate indifference claim.

      **E.**    **Respondeat Superior**

Respondeat superior is an insufficient basis for § 1983 liability. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). Instead, unless "the supervisor personally participates in the alleged unconstitutional conduct," supervisory liability attaches only when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged [constitutional] deprivation, and he fails to do so," the execution of a governmental policy or custom results in the Plaintiff's injury, or "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.*

Sheriff Brown never had any personal contact with plaintiff. (Aff. of Thomas Brown ¶ 10.) Plaintiff does not allege that Sheriff Brown personally served his meals, provided him medical treatment, or responded to the attack. Rather, as to these claims, plaintiff alleges that Sheriff Brown is vicariously liable for the actions of his subordinates. However, plaintiff presented no evidence that Sheriff Brown (1) was on notice of a subordinate's unconstitutional conduct and failed to correct it through further training and supervision, (2) implemented a policy or custom that resulted in plaintiff's injuries, or (3) instructed a subordinate to commit constitutional violations, or knew that a subordinate would do so, but failed to stop him or her. Accordingly, Sheriff Brown is entitled to summary judgment in his supervisory capacity.

### III. Non-service of defendants Palmer, Jackson, Williams, Thomas, Myles, and Chapman

Plaintiff first brought his claims against defendants Palmer, Jackson, Williams, Thomas, Myles, and Chapman on June 29, 2009. The court allowed those claims to proceed on September 17, 2009. Requests for waivers of service were mailed to these defendants on October 13, 2009. When the waivers were not returned, the U.S. Marshal's Service attempted personal service. On May 4, 2010, the U.S. Marshal went to the jail and was told that the desk sergeant could not accept service without

the defendants' full first names. Because plaintiff's claims against these defendants have been pending for nearly a year and the court is granting summary judgment to all the remaining defendants, plaintiff's claims against Officer Palmer, Officer Jackson, Officer Williams, Officer Thomas, Grievance Coordinator Myles, and Nurse Chapman are dismissed for failure to perfect service. *See* Fed. R. Civ. P. 4(m), 12(b)(5) and 41(b).

### IV.  Conclusion

For the reasons set forth above, defendants' motion for summary judgment [104] is hereby **GRANTED**.

Further, plaintiff's claims against Officer Palmer, Officer Jackson, Officer Williams, Officer Thomas, Grievance Coordinator Myles, and Nurse Chapman are hereby **DISMISSED** for lack of service.

The Clerk of Court is **HEREBY DIRECTED** to close this case.

**IT IS SO ORDERED** this 17th day of September, 2010.

WILLIAM C. O'KELLEY
Senior United States District Judge